## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

   Plaintiff,

vs.             No. 19-CR-00405 MV

DIDIER GONZALEZ-MORALES,

   Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** is before the Court on Defendant Didier Gonzalez-Morales' objections to the Presentence Report.  Docs. 49, 74.  The government filed responses to his objections [Docs. 55, 77] and the United States Probation Office filed two addendums to the Presentence Report [Docs. 50, 76].  The Court held an evidentiary hearing on January 27, 2022, and continued the sentencing to February 22, 2022.  Doc.  78.  At the sentencing hearing, the Court addressed Mr. Gonzalez-Morales' objections and sentenced him to a term of imprisonment of 38 months or time served, whichever is less, followed by a five-year period of supervised release.   In this Memorandum Opinion and Order, the Court will provide further context for its decision.

## PROCEDURAL BACKGROUND

On January 21, 2020, Mr. Gonzalez-Morales pled guilty to a one-count Indictment charging him with Possession of Visual Depictions of Minors Engaged in Sexually Explicit Conduct, in violation of 18 U.S.C. §§ 2252A(a)(5)(B), (b)(2), and 2256.  Docs. 3, 44.

Mr. Gonzalez-Morales raised four objections to the Presentence Report.  *See* Docs. 49, 74. First, Mr. Gonzalez-Morales objected to the application of the cross reference at U.S.S.G. § 2G2.2(c)(1), which elevated his base offense level from 18 to 32.  Doc. 49 at 1–7.  The Court

overruled this objection, finding that the cross reference is applicable.  Next, Mr. Gonzalez-Morales objected to every factual assertion alleging that he used force, threats, or intimidation against Jane Doe.  Doc. 49 at 7–15 (Objections 2–3).  The Court sustained these objections, finding that Mr. Gonzalez-Morales did not use force, threats, or intimidation against Jane Doe.  Finally, Mr. Gonzalez-Morales objected to the application of the special offense characteristic in § 2G2.1(b)(2), which elevated his offense level by four levels.  Doc. 74 at 1–4.  The Court sustained this objection in part, finding that the offense involved the commission of a sexual act or sexual contact, but that it did not involve the type of conduct described in 18 U.S.C. § 2241(a).  Hence, the Court found that the two-level enhancement was appropriate, but that the four-level enhancement was not.

Having addressed Mr. Gonzalez-Morales' objections, the Court then considered the advisory United States Sentencing Guidelines as well as each of the additional factors stated in 18 U.S.C. § 3553(a).  In imposing a reasonable sentence that was sufficient, but not greater than necessary, to comply with the purposes set forth in Section 3553(a), the Court determined that a downward variance was appropriate and sentenced Mr. Gonzalez-Morales to a term of imprisonment of 38 months or time served, whichever is less, followed by a five-year period of supervised release.  At the time he was sentenced, Mr. Gonzalez-Morales had been in custody for 1,178 days.  Doc. 47 at 1.

## FACTUAL BACKGROUND

Mr. Gonzalez-Morales pled guilty to Possession of Visual Depictions of Minors Engaged in Sexually Explicit Conduct after sexually explicit photos and videos of Jane Doe were found on his phone.  Docs. 3, 44.  However, the circumstances which ultimately led to Mr. Gonzalez-Morales' plea are hotly contested.  While some facts are undisputed, Mr. Gonzalez-Morales' and

Jane Doe's versions of the past are very different.

## I.    Undisputed Facts

On June 15, 2018, Mr. Gonzalez-Morales asked Jane Doe to be his girlfriend after connecting with her on Instagram.  Doc. 47 ¶ 14; Doc. 72-1.  At the time, Mr. Gonzalez-Morales was 25 years old, and Jane Doe was 13 years old.  Doc. 47 ¶¶ 16, 19.  However, both Mr. Gonzalez-Morales and Jane Doe lied about their ages.  *Id.* ¶ 19.  Mr. Gonzalez-Morales claimed to be 23 years old, and Jane Doe claimed to be 15 years old.  *Id.* ¶¶ 14, 19.

Over the next five-and-a-half months, their relationship progressed quickly.  They exchanged over 10,000 messages.  For context, Mr. Gonzalez-Morales submitted a record of their text messages for just four months of their relationship; the messages therein spanned nearly 2,000 pages.  *See* Doc. 84-2.  At least once each day, they exchanged "love letters" over text message, professing their undying love for each other, expressing their hope to marry and start a family, and thanking God for bringing them together.  *See id.*  If Mr. Gonzalez-Morales forgot to send a "love letter," Jane Doe would remind him.  *Id.* at 9.  Jane Doe herself never forgot to send one.  *See generally id.*  Indeed, Jane Doe often sent more than one "love letter" a day, and as time went by they grew longer and longer, often spanning multiple pages.  *See, e.g.*, *id.* at 1384–85, 1387–88, 1390, 1394–95 (showing four "love letters" that Jane Doe sent over a 24-hour period).

Jane Doe also wrote a similar, if shorter, "love letter" in a school notebook.  *See* Doc. 84-1.  In this letter, dated November 6, 2018, Jane Doe described Mr. Gonzalez-Morales as "the great love of my life."  Jan. 27, 2022 Hr'g Tr. at 30:9 (available upon request).  She wrote that on:

> June 15th, 2018, he and I, the great love of my life, we met on Instagram.  One day later, when God lit up our hearts to be happy, we began messaging each other [. . .] and all of a sudden, I fell very much in love with him, and I knew he would be the great love of my life.  I really fell in love with him, just seeing his beautiful face.  And I never imagined that he would feel the same about me.  Now we have four and a half months and we're going to complete five months together which makes

3

me very happy because I love him so much.  God sent me a little Angel.  Because when I felt like my life no longer had meaning, God [sent me] the man I've always dreamed of.  I never imagined he'd make me so happy these five months.  And I ask God that they become years, [and that I am] able to marry and form a pretty family with the love of God, always together, always happy, very happy.

*Id.* at 30:8–23.  Jane Doe never sent this letter to Mr. Gonzalez-Morales.  *Id.* at 31:12–13.

In addition to the "love letters," Jane Doe sent Mr. Gonzalez-Morales a stunning number of impromptu declarations of love.  She texted him "I love you" thousands of times in a row; together, these messages spanned nearly 300 pages.  Doc. 84-2 at 1436–96, 1501–62, 1616–1729.  She referred to him as her "future husband" nearly 100 times.  *See generally id.*  She expressed her desire to start a family with him more than 150 times.  *See id.*  In total, Jane Doe sent nearly 1,000 more messages than Mr. Gonzalez-Morales sent, and her messages were frequently significantly longer.  *See id.*

Their relationship was also marked by insecurity and jealousy.  They texted each other constantly throughout the day, every day, keeping each other apprised of their schedules and locations, as well as reiterating their constant devotion.  *See, e.g.*, *id.* at 10.  If one of them took too long to respond, the other responded with jealousy.  *See, e.g.*, *id.* at 15.  More often than not, Jane Doe was the one to express jealousy, cycling between anger, fear, love, and depression when Mr. Gonzalez-Morales failed to respond quickly enough.  *See, e.g.*, *id.* at 1138–44 ("Reply please . . . My love please . . . Please . . . Please!!!!!!!! . . . My love please if you love me reply . . . I can't live without you . . . Please I'm begging you for God's sake . . . Answer me"); 1338–40 ("[A]re you mad at me? . . . I don't know what I did wrong or what's up with you, but remember that I love you very much and I'm never going to stop loving you because you are the one I love most in this world." [*see* Jan. 27, 2022 Hr'g Tr. at 45:9, 46:8–11]); 1567–69 ("Have confidence in me . . . I don't want to lose you." [*see* Jan. 27, 2022 Hr'g Tr. at 48:18–24]).

4

In sum, their text exchanges had many of the markers of a normal romantic relationship. They exchanged love songs. *See, e.g.*, *id.* at 631–32. They exchanged more than 400 photos and more than 75 videos. *See generally id.* And, at some point, they also began to exchange sexually explicit messages, photos, and videos. *See id.*

The first months of their relationship are not preserved, but where the record picks up, the sexual nature of their relationship is immediately apparent. For example, in an exchange on September 3, 2018, Jane Doe got upset with Mr. Gonzalez-Morales for watching TV instead of watching her shower, writing "I want you to watch meeee." *Id.* at 53. On September 8, 2018, Jane Doe thanked Mr. Gonzalez-Morales for buying her clothes and suggested that she would try them on for him in a video call. *Id.* at 130–31. On October 20, 2018, Mr. Gonzalez-Morales asked Jane Doe to send him a photo of her vagina. *Id.* at 704. The next day, in a text conversation that appears to have occurred simultaneously to a video call, Mr. Gonzalez-Morales gave Jane Doe directions for how to masturbate on camera, directing her to lift a leg and touch herself in certain ways. *Id.* at 716–18. On November 4, 2018, Jane Doe sent Mr. Gonzalez-Morales a photo of her vagina, accompanied by a two-page "love letter" thanking God for connecting them, professing her everlasting love and fidelity, referring to Mr. Gonzalez-Morales as the love of her life and her future husband, and expressing her desire to have sexual relations and start a family with him. *Id.* at 966–68. On November 11, 2018, she sent a photo of her nude body. Doc. 1 ¶ 7.

As time went by, Jane Doe and Mr. Gonzalez-Morales began to make plans to meet in person. At the time, Jane Doe lived in New Mexico and Mr. Gonzalez-Morales lived in Georgia, so they considered various options for how to meet. *See generally* Doc. 84-2. For example, in September 2018, Mr. Gonzalez-Morales looked for work that would allow him to move to New Mexico. *Id.* at 174. However, they eventually settled on the plan that Mr. Gonzalez-Morales

would travel out to New Mexico to pick up Jane Doe and take her back to Georgia, where they would eventually wed and live together. *See generally id.* Mr. Gonzalez-Morales began saving money in September 2018 to be able to hire a driver for the trip. *Id.* at 175. Because he was undocumented, he preferred to hire someone else to drive. *See id.* By November 2018, Mr. Gonzalez-Morales began to take concrete steps to plan for his future with Jane Doe. For example, on November 23, 2018, he promised Jane Doe that he would buy a laptop the next day so that she would be able to continue her studies when she moved to Georgia. *Id.* at 1309. By the end of the month, he had secured a driver to make the trip out to New Mexico. *Id.* at 1310.

As their plans became more concrete, the sexual nature of their relationship also escalated, and on November 18, 20, and 25, 2018, Jane Doe sent Mr. Gonzalez-Morales videos of herself masturbating. Doc. 1 ¶ 7. While the first such video went largely unacknowledged in their text exchanges, the latter two involved detailed discussions of their sexual desires. For example, on November 20, 2018, Jane Doe explained that she was sending him a video of her vagina so that Mr. Gonzalez-Morales would feel greater urgency to come see her in New Mexico. Doc. 84-2 at 1156. He responded saying that he would make love to her when she was ready. *Id.* at 1168. She assured him she was already more than ready, followed by a flurry of emojis. *Id.* at 1169. On November 25, 2018, Jane Doe asked Mr. Gonzalez-Morales to make love to her the first day they saw each other, and he promised he would. *Id.* at 1361. On December 1, 2018, Mr. Gonzalez-Morales told Jane Doe that he wanted to perform oral sex on her; seconds later, she responded "Ohh yes daddy." *Id.* at 1595.

At first glance, Mr. Gonzalez-Morales' and Jane Doe's text messages seem to indicate that Jane Doe's family and friends supported their relationship, despite the age difference. It appeared that various members of Jane Doe's family and social circle had sent well-wishes to Mr. Gonzalez-

6

Morales.  In reality, Jane Doe fabricated each of these purported conversations with her family and friends.  *See* Jan. 27, 2022 Hr'g Tr. at 18:13–16, 32:7–14, 36:15–16, 72:20–25.  She pretended to be other people on numerous occasions.  For example, on September 6, 2018, Jane Doe sent a series of text messages purporting to be from her best friend Aracely, in which "Aracely" advised Mr. Gonzalez-Morales to treat Jane Doe well and to never break up with her.  Doc. 84-2 at 77.  He responded saying that he would always love Jane Doe and that any friend of Jane Doe was a friend of his.  *Id.* at 83.  On September 8, 2018, Jane Doe sent a series of text messages purporting to be from her brother Cesar, in which "Cesar" asked Mr. Gonzalez-Morales why he liked Jane Doe and said that she had been crying because she missed him.  *Id.* at 139–41.  Mr. Gonzalez-Morales responded with concern, reiterating that he loved Jane Doe and asking to speak to her to see why she had been crying.  *Id.*  On September 9, 2018, Jane Doe sent a series of text messages purporting to be from her mother, in which "her mother" told Mr. Gonzalez-Morales that Jane Doe had been crying, offered to find him a job in New Mexico, offered to send him money to travel to New Mexico, and gave her and her husband's blessing for Jane Doe and Mr. Gonzalez-Morales to get married.  *Id.* at 170–81.  Mr. Gonzalez-Morales thanked her profusely for her blessing and asked God to bless their whole family.  *Id.* at 181–82.  However, Mr. Gonzalez-Morales rejected the offer of financial support because he wanted to earn his own money to prove to Jane Doe that he would fight for her.  *Id.*  at 176–77.  On October 10, 2018, Jane Doe sent a series of text messages purporting to be from her friend Gabriela, in which "Gabriela" said that she that looked forward to meeting Jane Doe's boyfriend.  *Id.* at 578.  Mr. Gonzalez-Morales responded by saying that he looked forward to marrying the love of his life, Jane Doe, and that they hoped to have two children together.  *Id.*  On November 3, 2018, Jane Doe sent a series of text messages purporting to be from her aunt Cecilia, in which "Cecilia" told Mr. Gonzalez-Morales that Jane Doe had been crying due

to a fight with him.  *Id.* at 920–21.  Mr. Gonzalez-Morales expressed how happy it made him to talk to Jane Doe's family and then apologized for making Jane Doe cry.  *Id.*  Jane Doe then sent a series of text messages purporting to be from her uncle Jose, in which "Jose" told Mr. Gonzalez-Morales that Jane Doe talked about him and when she would see him constantly.  *Id.* at 924–27.  Mr. Gonzalez-Morales replied by reiterating his love for Jane Doe and expressing his hope that the trip to New Mexico would go well since he was undocumented.  *Id.* at 927.  On November 23, 2018, Jane Doe again sent a series of text messages purporting to be from her mother, in which "her mother" told Mr. Gonzalez-Morales that she had given Jane Doe permission to be with him and that she knew about his plans to come for her in New Mexico.  *Id.* at 1307–08.  Mr. Gonzalez-Morales responded by thanking her for her support and admitting that he was willing to risk traveling across the country while undocumented because he loved Jane Doe so much.  *Id.*

Not only did Jane Doe fabricate each of these conversations, but she went so far as to fabricate the existence of "Cesar" and "Gabriela" altogether.  *See* Jan. 27, 2022 Hr'g Tr. at 32:7–14.  These people do not and have never existed.  *Id.*  At the January 27, 2022 evidentiary hearing, Jane Doe admitted that she had never told anyone about her relationship with Mr. Gonzalez-Morales and that no one had ever spoken with him.  *Id.* at 18:13–24.  Her parents never knew of his existence, let alone gave a blessing for their relationship or for Jane Doe's planned move to Georgia.  *Id.*

Nevertheless, in the final days of November 2018, Jane Doe assured Mr. Gonzalez-Morales repeatedly that her parents had given her permission to move to Georgia to be with him and that she could not wait to start a new life with him.  *See, e.g.*, Doc. 84-2 at 1429.  Moreover, on November 29, 2018, when Jane Doe turned fourteen, she again lied about age, telling Mr. Gonzalez-Morales that now that she was finally "sixteen," she was ready to leave her past behind

and start a new life with him.  *Id.* at 1418.  This was particularly significant given the Georgia law allowing sixteen-year-olds to wed, so long as they have parental consent.  *See* Ga. Code Ann. § 19-3-2 (2018).  Accordingly, Mr. Gonzalez-Morales hired a woman named Blanca Vazquez to drive him from Georgia to New Mexico to pick up Jane Doe and drive them back to Georgia.  Doc. 47 ¶ 27.

In the two days that it took for Mr. Gonzalez-Morales to reach New Mexico from Georgia, he and Jane Doe exchanged messages spanning more than 150 pages.  Doc. 84-2 at 1579–1742.  Their excitement was palpable.  When Blanca Vazquez charged Mr. Gonzalez-Morales extra for the trip, Jane Doe promised him she would bring money along to buy them food on the trip back to Georgia.  *Id.* at 1583, 1735.  When Jane Doe missed a call from Mr. Gonzalez-Morales, she explained it was because she was packing a suitcase for the move.  *Id.* at 1598.  As he got closer, Mr. Gonzalez-Morales asked Jane Doe if he and Blanca Vazquez could stay the night with Jane Doe's family, but ultimately stopped somewhere else for the night when it got too late to keep driving.  *Id.* at 1606–09, 1612–13.  They also expressed their excitement to be together physically.  When Mr. Gonzalez-Morales asked Jane Doe what she wanted him to do to her, she responded, "Anything you want my love. . . . I'm all yours."  *Id.* at 1593.

On the morning of December 2, 2018, Jane Doe told her family that she was stepping out to check the mailbox.  Jan. 27, 2022 Hr'g Tr. at 22:2; Doc. 47 ¶ 15.  Instead, she got into a van with Mr. Gonzalez-Morales and Blanca Vazquez and set out for Georgia.  Doc. 47 ¶¶ 15, 27.

After Jane Doe failed to return home, her family began sending her frantic text messages, asking where she was and begging her to come home.  *See* Doc. 49-19 at 8–9.  She did not reply until around 11:30 PM, when she texted her mother and father to say that she wanted to go home but did not know where she was.  *See, e.g.*, *id.* at 8.  Five minutes later, she said she was really

scared. *Id.* at 6. Although her parents asked her to send any details she had about her location, she refused to send a photo of her location. *Id.* at 5–7. She then claimed that her cell phone was dying and ceased to communicate with her family from midnight until the next day around 3 PM. *Id.* at 4–5. However, records extracted from her phone show that she was using her phone around both 1:15 AM and 3:30 AM the same night. *Id.* at 5.

At some point in the early hours of December 3, 2018, Jane Doe performed oral sex on Mr. Gonzalez-Morales. Doc. 47 ¶ 14. Later that day, around 12:30 PM, Jane Doe texted Mr. Gonzalez-Morales, telling him that she loved him and never wanted to lose him and asking him whether he was turned on. Doc. 84-2 at 1748–49. When Mr. Gonzalez-Morales asked her whether she enjoyed performing oral sex earlier that morning, Jane Doe replied "Ohh yes daddy." *Id.* at 1750.

Later that afternoon, around 3 PM, Jane Doe began to communicate with her family again, saying that she had found a charger and was stopped at a store in Texas, where she had asked for and was receiving help. Doc. 49-19 at 3–4. However, she refused to give more information about her whereabouts. *Id.* Then, at 7:20 PM, Jane Doe told her mother that someone had called 911 and that they were going to help her get home. *Id.* at 2. Meanwhile, her Safari browser history shows that between 6:26 PM and 6:30 PM on December 3, 2018, Jane Doe searched "love quotes for him." Doc. 49-13 at 3–4.

Throughout the trip, her actions seem to indicate ambivalence at the thought of returning home. At some point during the trip, Jane Doe messaged a friend through Snapchat, stating that she had been taken and that her abductors had hurt her legs. Doc. 49-20 at 4, 6. When her friend urged her to turn on her location sharing or call the police, Jane Doe said someone had already called the police for her and refused to turn on her location sharing or give further details about her location. *Id.* at 5, 7. When a police officer with the Espanola Police Department texted Jane

10

Doe asking her to call 911 or to take a picture of her location, she did not reply.  Doc. 49-21 at 1.

At no point did Jane Doe call 911 or have anyone call 911 on her behalf.

Eventually, on December 3, 2018, Jane Doe's phone was pinged by law enforcement and the vehicle in which she was traveling was pulled over in Mississippi.  Doc. 47 ¶¶ 14–15.  Mr. Gonzalez-Morales was arrested and has been in continuous custody ever since.  *Id.* at 1.

## II.    Jane Doe's Version

Jane Doe's version of events has changed over time.  On December 4, 2018, Jane Doe was interviewed by law enforcement in Tupelo, Mississippi.  Doc. 47 ¶ 16.  In this interview, she referred to Mr. Gonzalez-Morales as her "boyfriend," and explained that her parents did not know about him because she was not allowed to have a boyfriend.  Doc. 66 at 11.  She reported that two months into their relationship, he broke up with her because she was too young, but the next day he asked her to be his girlfriend again, and she said yes.  *Id.*  Jane Doe said that when he arrived to pick her up on December 2, 2018, "He waited for me at the front of the trailer park—I went over there and he told me if I wanted to go, or I could stay with my family, but I decided to go."  *Id.*  However, as they were leaving New Mexico, she began to cry because "I knew I was making a bad choice, leaving my family."  *Id.*  She said, "He told me that we could go back," but Blanca Vazquez had refused to turn around because it would be too expensive.  *Id.*  Jane Doe told law enforcement that Mr. Gonzalez-Morales had kissed her on the neck, leaving a hickey, but had stopped and apologized when she asked him to stop.  *Id.*  When asked about further sexual contact, Jane Doe said that Blanca Vazquez had falsely reported such contact because she was mad at Jane Doe "because I told them [falsely] that my parents knew that I was going with them."  *Id.* at 12.  She also disclosed that Mr. Gonzalez-Morales had sent her pictures of his penis and asked her for sexually explicit photos and videos.  *Id.*  She reported that she sent images "a lot of times . . .  He

told me to send them or else he'd break up with me." *Id.* The first time, she said, "He told me if I really loved him I'd send him a video or he'd break up with me . . . When we barely started dating." *Id.*

Jane Doe's story changed when she participated in a second forensic interview in Albuquerque, New Mexico on January 24, 2019. Doc. 47 ¶ 19. In this interview, she alleged that Mr. Gonzalez-Morales "became mean and threatening" approximately one month into their relationship, directing her to "send him videos of herself, or he would kill her family." *Id.* ¶ 20. She also alleged that he was emotionally abusive, saying "He would tell me he doesn't love me, doesn't like me, make me think bad about myself, like I didn't deserve to be in this world anymore." Doc. 66 at 12. Jane Doe reported that he would tell her she was "stupid and I should kill myself and then he would call me back and say I was beautiful." *Id.* She reported, "He was always mean to me and he would always mention my family and that's what made me scared." *Id.* She alleged that he only made such comments and threats during video chats and that he repeatedly told her to only put "beautiful things" in her text messages. Doc. 47 ¶ 20. Jane Doe alleged that he instructed her to impersonate her mother in order to indicate her parents' approval of their relationship. *Id.* She also stated that she followed his specific instructions about the images and videos and left with him on December 2, 2018, in order to protect her family from harm. *Id.* Jane Doe explained that she lied in her first interview because she was scared, nervous, and fearful for her family. *Id.* ¶ 22. Finally, she stated that Mr. Gonzalez-Morales forcibly grabbed her head, forced her to give him oral sex, and made her swallow his semen when he ejaculated. *Id.*

At the January 27, 2022 hearing, Jane Doe testified that her text messages were dictated by Mr. Gonzalez-Morales. Jan. 27, 2022 Hr'g Tr. at 49:22–24, 59:4–5. She testified that he would script their text conversations over the phone and that "then we would hang up and then I would

type those things." *Id.* at 50:3–9.  Jane Doe conceded that stylistic choices, such as spacing, the use of capital letters, or the arrangement of emojis, were her own.  *Id.* at 37:20–22, 43:4–11, 47:25–48:1, 55:19–25, 56:21–23, 58:3–4, 59:13–15, 61:17–22, 70:19–20.  She explained that although she did not think that anyone would check her phone, the text exchanges were drafted "so if anyone checked my phone, they knew that everything was okay and there was nothing wrong going on," and that her family was okay with the relationship.  *Id.* at 17:12–13, 72:20–22.  She also testified that the idea behind inventing "Cesar" and "Gabriela" was to convince anyone that checked her phone that "more people knew about this situation" and that "the whole family agreed that I was dating him." *Id.* at 72:7–15.

## III.    Mr. Gonzalez-Morales' Version

According to Mr. Gonzalez-Morales, he met Jane Doe through Instagram when "[h]e saw that her last name was the same as his and thought maybe she was from Chiapas, and so he 'liked' her post, and she accepted."  Doc. 66 at 14.  He reported that he quickly asked her to be his girlfriend and that they communicated all day long, every day via messages and video chats.  *Id.* He said Jane Doe always said she wanted to get married and acted like they were already engaged. *Id.* He also said she would act jealous of him and get really worried if he did not have minutes for his cell phone. *Id.* He described himself as "really in love with her." *Id.* Jane Doe was the longest romantic relationship Mr. Gonzalez-Morales had ever had. *Id.*

Mr. Gonzalez-Morales reported that it was his impression that Jane Doe "suffered a lot at home, and she wasn't happy." *Id.* For example, he believed that her uncle, and possibly her cousin, wanted to rape her. *Id.* He also reported that Jane Doe once showed him marks on her back and claimed that one of her parents had physically abused her. *Id.* at 15. Given the history of sexual and physical abuse in his own family, this was extremely distressing to him. *Id.* at 14.

As such, Mr. Gonzalez-Morales reported that his plan was to marry her and live with Jane Doe in Georgia, but that he "would take her to her family if she didn't want to stay with me." *Id.* at 15. He also reported that he initially ended their relationship because he thought she was too young, but got back together with her, in part, because she was suffering. *Id.* When he learned her real age around the time he arrived in New Mexico, he nevertheless decided to take her with him, back to Georgia, because he believed she was mistreated at home. *Id.* Furthermore, despite his misgivings about her age, he reported that he knew many couples in Georgia with similar age gaps and similarly young female partners. *Id.*

Mr. Gonzalez-Morales stated in interviews with Dr. Christine Johnson that it was his idea to ask Jane Doe for sexually explicit photos and videos. *Id.* He said that he did not know where he got the idea to ask for this and eventually stated that "I fell in love with her, and I never forced her, I just asked if she would send me pictures of her body with clothes, and she said, 'with or without,' and I said 'without if you want,' and she said 'OK.'" *Id.* He reported that he had never exchanged sexually explicit photos with anyone before Jane Doe and denied sharing Jane Doe's photos or videos with anyone. *Id.* When asked when he started to threaten Jane Doe he replied, "God knows, I never did that!" *Id.* He said, "I never threatened her - She threatened me that she was going to commit suicide because she was suffering so much if I didn't go pick her up." *Id.* He reported that she spoke of suicide several times. *Id.*

Mr. Gonzalez-Morales eventually formed the plan to come to New Mexico after Jane Doe told him she was suffering and could not take it anymore. *Id.* at 16. He was scared to make the drive because of his undocumented status and because his mother had a dream that he would be arrested. *Id.* Nevertheless, he proceeded with the trip and hired Blanca Vazquez to drive him. *Id.*

Mr. Gonzalez-Morales reported that his initial meeting with Jane Doe did not go as

planned.  *Id.*  He expected her to meet him with a suitcase at her house, but instead she told him to

meet her around the corner from the house and came without a suitcase.  *Id.*  "[S]he was even

wearing dirty clothes."  *Id.*  He reported that "She didn't get in the car with me right off the bat -

She said, 'Come talk to me over here on the curb,' so I did."  *Id.*  Eventually, she got in the car

with him and gave him a letter, purportedly from her parents, giving her permission for the trip.

*Id.*  While still fairly close to Jane Doe's house, Mr. Gonzalez-Morales had second thoughts and

told her "'I'm going to go - I'll come back and see you every 3 or 5 months,' and she said, 'No,

I'm suffering here.'"  *Id.* at 17.  So, he proceeded with the trip.  *Id.*

    Mr. Gonzalez-Morales reported that the trip was difficult for both of them.  *Id.*  For

example, when she refused to eat, he cried "like a little boy."  *Id.*  Otherwise, although he believed

she was sad to be leaving her family, he reported that he did not see her cry until they were pulled

over in Mississippi.  *Id.*  He also reported that when he asked her once if she wanted to go home,

she said no.  *Id.*  He also admitted that "I didn't want to take her back because Blanca was going

to charge me more money and I didn't have the money."  *Id.*

    With regard to sexual contact, Mr. Gonzalez-Morales reported that he had planned to wait

until marriage.  *Id.*  However, according to his report, Jane Doe asked him to join her in the

backseat, they started to talk and then to kiss and touch each other, and then she expressed a desire

for more sexual intimacy.  *Id.*  Mr. Gonzalez-Morales reported that he said initially said no, but

that he relented because he believed that she wanted to be sexual with him after all the messages

they had exchanged and because she had told him "If you don't love me, just leave me here."  *Id.*

    When Mr. Gonzalez-Morales was interviewed by law enforcement in Mississippi, he

confessed that he had received four or five sexually explicit photographs from Jane Doe. Doc. 47

¶ 17.  He also confessed that he had touched Jane Doe's legs and buttocks, had not touched her

vagina, and had received oral sex from Jane Doe and ejaculated in her mouth while stopped at a rest area. *Id.* He stated that he had believed Jane Doe was 15 when they met, and 16 at the time of the trip from New Mexico. *Id.* His belief regarding her age is particularly important because Georgia law provides that marriage with parental consent is valid beginning at age 16. *See* Ga. Code Ann. § 19-3-2 (2018).

> Mr. Gonzalez-Morales made the following admission of facts in his plea agreement:

> On or about December 2, 2018, in Rio Arriba County, in the District of New Mexico, I, Didier Gonzalez-Morales, knowingly possessed material containing visual depictions of a minor engaged in sexually explicit conduct, which was produced using materials which had been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including by computer. More specifically, on December 2, 2018, I traveled to the District of New Mexico. At that time, my Apple iPhone cellular phone, FCC ID BCG-E2816A, contained three videos and two images depicting [Jane Doe]. (YOB 2004) engaged in sexually explicit conduct, which is child pornography. I now know that my iPhone was manufactured in China. Therefore, the device traveled in foreign and interstate commerce before reaching New Mexico. I understand that the use of this device and the use of the Internet in the commission of this offense affected interstate or foreign commerce.

Doc. 44 ¶ 7.

At the time of his interview with Dr. Johnson, Mr. Gonzalez-Morales did not appear to harbor any belief or hope of an ongoing loving connection between himself and Jane Doe. Doc. 66 at 17. Instead, he made statements like "I don't wish that girl anything bad, and I just wish that she seek God and no longer lie to her family and friends—I just want God to touch her heart so she won't lie anymore." *Id.*

## DISCUSSION

## I.   Objections

### A. Objection to the Cross Reference at U.S.S.G. § 2G2.2(c)(1)

First, Mr. Gonzalez-Morales objects to the cross reference at U.S.S.G. § 2G2.2(c)(1). Doc.

49 at 1.  If not for the cross reference, Mr. Gonzalez-Morales' base offense level would be 18.  *See*

U.S.S.G. § 2G2.2(a)(1).  However, the Presentence Report applies the cross reference at Section

2G2.2(c)(1), elevating his base offense level to 32.  Doc. 47 ¶ 38.

> Section 2G2.2(c)(1) provides, in relevant part:
>
> If the offense involved causing, transporting, permitting, or offering or seeking by notice or advertisement, a minor to engage in sexually explicit conduct[1] for the purpose of producing a visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, apply § 2G2.1.

U.S.S.G. § 2G2.2(c)(1).  Application Note 7 further provides:

> The cross reference in subsection (c)(1) is to be construed broadly and includes all instances where the offense involved employing, using, persuading, inducing, enticing, coercing, transporting, permitting, or offering or seeking by notice or advertisement, a minor to engage in sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting live any visual depiction of such conduct.

U.S.S.G. § 2G2.2 cmt. n.7(A).

The relevant inquiry in the instant case is whether Mr. Gonzalez-Morales *caused* or

*permitted* "a minor to engage in sexually explicit conduct for the purpose of producing a visual

depiction of such conduct."  § 2G2.2(c)(1).  Pursuant to Application Note 7, "caused" can be

rephrased as persuaded, induced, enticed, coerced, or permitted.  § 2G2.2 cmt. n.7(A).

Mr. Gonzalez-Morales argues that he did not intimidate, threaten, or force Jane Doe in any

way.  Doc. 49 at 7.  Thus, instead of addressing whether he *caused* Jane Doe's actions, he argues

that he did not *permit* Jane Doe to engage in sexually explicit conduct *for the purpose* of producing

a visual depiction of such conduct.  *Id.* at 2.  Specifically, he argues that he "had no purpose with

respect to the production of the illicit images in this case because he was not involved in their

---

[1] Pursuant to Application Note 7, "[s]exually explicit conduct" includes masturbation or lascivious exhibition of the genitals.  *See* U.S.S.G. § 2G2.2 cmt. n.7(B); 18 U.S.C. § 2256(2).

production.  He did not know they had been produced until he received them." *Id.*  Mr. Gonzalez-Morales concedes that he solicited a photo of Jane Doe's genitalia on October 20, 2018.  *Id.* at 6; Doc. 49-8 at 13–17.  However, he argues that he immediately backtracked and there was no other discussion leading up to the production or transmission of any of the sexually explicit photos or videos that Jane Doe sent Mr. Gonzalez-Morales on November 4, 11, 18, 20, or 25, 2018.  Doc. 49 at 2–6; Doc. 49-8 at 13–17.  Thus, he argues that "there is no evidence that he was even aware that she was creating the illicit images prior to his receiving them."  Doc. 49 at 5.  Further, he argues that the "totality of the communications between the two overwhelming[ly] demonstrate that his purpose with respect to her was the pursuit of a romantic relationship, including marriage, and not about producing illicit images." *Id.*

The government responds that the cross reference is appropriate because Mr. Gonzalez-Morales, in fact, caused Jane Doe to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct.  Doc. 55 at 5.  The government asserts that Mr. Gonzalez-Morales caused Jane Doe's behavior not only by requesting an image of her genitalia on October 20, 2018, but by "request[ing] explicit material from her on multiple occasions through video chats." *Id.*

Probation responds that the cross reference is appropriate because Mr. Gonzalez-Morales coerced Jane Doe "to photograph and videotape herself engaging in sexually explicit conduct." Doc. 50 at 3.  Probation asserts that Mr. Gonzalez-Morales coerced Jane Doe by demanding videos, acting "mean and threatening," and threatening to "kill her family." *Id.* at 2.

The Court finds that Mr. Gonzalez-Morales' offense involved causing Jane Doe "to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct." U.S.S.G. § 2G2.2(c)(1).  "Neither the guideline nor the commentary states that . . . the defendant

must be the one who is behind the camera. A defendant's conduct may be one step removed from the actual production and still fall within the ambit of the cross-reference." *United States v. Garcia*, 411 F.3d 1173, 1179 (10th Cir. 2005). By asking Jane Doe to send him a photo of her genitalia, as well as by sending photos of his genitalia and encouraging and developing a relationship that was highly sexual in nature, Mr. Gonzalez-Morales caused, persuaded, induced, and enticed Jane Doe to produce a visual depiction of sexually explicit conduct. *See id.* (citing *United States v. Whitesell,* 314 F.3d 1251, 1255 (11th Cir.2002) (rejecting the defendant's argument that he did not "cause" the production of images when he asked a fifteen year old girl to take pictures of herself and send them to him)); *see also United States v. Merrill*, 578 F. Supp. 2d 1144, 1153 (N.D. Iowa 2008) ("While Defendant did not explicitly ask B.G. to reciprocate, in emailing B.G. photographs of his penis he induced and enticed her to do so.").

Additionally, while the Court credits Mr. Gonzalez-Morales' argument that his primary purpose with respect to Jane Doe was "the pursuit of a romantic relationship," this does not negate the fact that he also pursued a sexual relationship with Jane Doe. Doc. 49 at 5. Even if Mr. Gonzalez-Morales' request for a sexually explicit photo was motivated by a desire to increase the intimacy of their relationship, it also, on its face, demonstrates his secondary purpose of seeking to produce a visual depiction of sexually explicit conduct. The cross reference is therefore applicable because it "applies when one of the defendant's purposes was to create a visual depiction of sexually explicit conduct, without regard to whether that purpose was the primary motivation for the defendant's conduct." *United States v. Veazey*, 491 F.3d 700, 707 (7th Cir. 2007); *United States v. Mai*, 291 F. App'x 910, 915 (10th Cir. 2008) (citing *Veazey* favorably). "This construction is fully consistent with the cross-reference's text, and any other reading would

violate the application note's instruction that the cross-reference be 'construed broadly.'" *United States v. Cox*, 744 F.3d 305, 309 (4th Cir. 2014).

Accordingly, the Court hereby **OVERRULES** Mr. Gonzalez-Morales' first objection and finds that pursuant to the cross reference at U.S.S.G. § 2G2.2(c)(1), his base offense level is 32.

### B.  Objections to Allegations of Force, Threats, or Intimidation

Next, Mr. Gonzalez-Morales objects to every factual assertion [Objection 2], and specifically Paragraph 27[2] [Objection 3] of the Presentence Report, alleging that he used force, threats, or intimidation against Jane Doe.  Doc. 49 at 7–15.  He argues that their text messages demonstrate that they were in a genuine relationship, that he attempted to communicate with Jane Doe's parents, that Jane Doe impersonated her parents via text, and that the "logistics that would be required for the voluminous text messages to be coerced out of the young woman are unimaginable." *Id.* at 14.  He also references Jane Doe's browser and messaging history while they were traveling to Georgia, pointing out that she texted him romantic and sexually explicit messages at the same time that she told friends and family members that she had been kidnapped, yet refused to respond to their questions about her location.  *Id.* at 10–14.  Thus, "he objects to, and denies strenuously, that there was any force, threats, or intimidation involved in anything between him and the young woman, and he denies further that he was involved in the production of child pornography." *Id.* at 15.

The government responds, arguing that the Presentence Report properly characterizes Mr. Gonzalez-Morales' conduct as threatening and coercive.  Doc. 55 at 6–8.  The government acknowledges that the factual dispute must be resolved through a credibility determination.

---

[2] Paragraph 27 alleges that Mr. Gonzalez-Morales coerced Jane Doe into sending him videos of herself, as well as forced her to give him oral sex.  Doc. 47 ¶ 27.

Probation responds by reiterating the factual allegations contained in the Presentence Report that Mr. Gonzalez-Morales used force, threats, and intimidation to coerce Jane Doe's behavior.  Doc. 50.

The Court finds that Mr. Gonzalez-Morales did not use force, threats, or intimidation against Jane Doe.  This finding comes down to a credibility determination made based upon the phone records and the testimony presented at the January 27, 2022 hearing.  Having carefully considered all the evidence, the Court finds that Jane Doe's allegations of force, threats, and intimidation are not credible.  The Court makes this finding for several reasons.

First, Jane Doe's allegations do not hold up to scrutiny because her actions during the trip to Georgia are not consistent with a person experiencing force, threats, or intimidation.  For example, in the course of the trip, Jane Doe sent messages to her family and friends, telling them that she had been taken, that she was scared, and that she had been injured by her purported abductors.  *See supra*.  It is simply not credible that Mr. Gonzalez-Morales would have allowed her to text such things had he actually been exerting control over her.  Had he truly been coercing Jane Doe, it stands to reason that Mr. Gonzalez-Morales would have exerted control over her phone—either by preventing her from contacting anyone or, at the very least, by forcing her to send reassuring messages to her family and friends.  It is clear that Jane Doe had unrestricted access to her phone.  Moreover, the Court finds it suspect that despite having unfettered access to her phone, Jane Doe did not call 911, did not respond to a police officer's text messages, did not share any additional details about her location, adamantly refused to activate location sharing on her cell phone, and then lied to everyone, falsely claiming that 911 had been called.  *Id.*  Instead, she used her phone to search "love quotes for him" and send romantic and sexually explicit messages to Mr. Gonzalez-Morales.  *Id.*  This behavior is not consistent with a victim of force,

threats, or intimidation.  It is, however, consistent with the behavior of a lovesick, runaway child who is scared of getting in trouble with her parents after spinning a colossal web of lies.

Additionally, Jane Doe's allegations are not credible because her text exchanges with Mr. Gonzalez-Morales are not consistent with a person experiencing force, threats, or intimidation. Jane Doe asserts that these text exchanges were coerced by him in an elaborate effort to make their relationship appear "okay."  Jan. 27, 2022 Hr'g Tr. at 17:12–13.  This claim is simply not credible. As discussed *supra*, the volume of messages the two exchanged is tremendous.  It does not stand to reason that Mr. Gonzalez-Morales singlehandedly scripted more than 10,000 messages while working a full-time job.  Moreover, Jane Doe's claim that he scripted all their conversations makes no sense in the context of her messages begging him to call her, her messages sent hours after he had gone to sleep due to the two-hour time difference, and her messages sent while the two of them were in the van with Blanca Vazquez, driving to Georgia.  *See supra*.  The claim makes even less sense in light of Jane Doe's phone records, which show multiple internet searches for "love quotes" over the course of their relationship.  *See* Docs. 49-12, 49-13, 49-19.  What need would she have had for these quotes if Mr. Gonzalez-Morales were scripting all their messages? Additionally, a close reading of their messages reveals that Mr. Gonzalez-Morales' and Jane Doe's use of language varies significantly, both grammatically and in terms of volume.  While Jane Doe's messages were typically much longer, she made the type of grammatical mistakes consistent with someone formally educated in English that were not present in Mr. Gonzalez-Morales' texts.  For example, Jane Doe often left prepositions hanging in her messages, while Mr. Gonzalez did not. *See, e.g.*, Doc. 84-2 at 1024 (Mr. Gonzalez-Morales: "la mujer *con* quien quiero formar una familia"), 1153 (Jane Doe: "al que quiero pasar el resto de mi vida *con*").  Finally, Jane Doe conceded in the January 27, 2022 hearing that she made all of the stylistic choices about the

messages, including spacing, the use of capital letters, and the arrangement of emojis.  Jan. 27, 2022 Hr'g Tr. at 37:20–22, 43:4–11, 47:25–48:1, 55:19–25, 56:21–23, 58:3–4, 59:13–15, 61:17–22, 70:19–20.  It strains credulity that someone experiencing force, threats, or intimidation would independently exercise the creativity necessary to regularly send messages like these:



Doc. 84-2 at 1080.  In sum, Jane Doe's text messages are not consistent with her claim to be a victim of force, threats, or intimidation.

Finally, Jane Doe's allegations appear to be untrustworthy because her explanation for *why* Mr. Gonzalez-Morales was coercing her to send text messages makes little sense.  Jane Doe asserts that he forced her to impersonate and even invent family members and friends in order to give the impression that "everything was okay and there was nothing wrong going on," and that her family was okay with the relationship.  Jan. 27, 2022 Hr'g Tr. at 17:12–13, 72:20–22.  Yet had her family members read such messages, they would have immediately known that something was wrong, since they would have noticed that she was impersonating them.  Likewise, any other person that might have searched Jane Doe's phone, such as a teacher or police officer, would have immediately found the messages inappropriate and alarming, given her age.  No rational adult would have fabricated such an elaborate text record involving frequent sexually explicit messages as a means

to persuade other people that the relationship was appropriate or acceptable.  It clearly was not. On the other hand, it makes far more sense that Jane Doe independently chose to impersonate and invent family members and friends, given that the messages purportedly sent from these people often involved subtle messaging aimed at getting Mr. Gonzalez-Morales to refrain from fighting with Jane Doe or to get him to further commit to her.  *See supra.*  Again, her allegations are simply not credible.

On the other hand, Mr. Gonzalez-Morales' story is consistent with both the text messages and the credible testimony of his mother (Blanca Morales-Morales), stepfather (Omar Leone), and sister (Jessica Gonzalez-Morales).  Each family member corroborated Mr. Gonzalez-Morales' version of events *supra* and indicated that they were aware of his relationship with Jane Doe and his intentions to marry her.  Doc. 47 ¶¶ 67–68; Doc. 66 at 13; Jan. 27, 2022 Hr'g Tr. at 96–119. Despite their potential loyalty to Mr. Gonzalez-Morales, the Court finds each family member's testimony credible, in no small part because they shared potentially self-incriminating information and because they shared their own personal reservations about Mr. Gonzalez-Morales' relationship with Jane Doe.  Such testimony stands in stark contrast to the testimony of Jane Doe's mother, Mireya Ornelas, who testified that her daughter had never lied to her, in spite of Jane Doe's admissions earlier in the same hearing that she had lied to her mother several times in the course of her relationship with Mr. Gonzalez-Morales.  Jan. 27, 2022 Hr'g Tr. at 94:21–24.

Accordingly, the Court adopts Mr. Gonzalez-Morales' version of events.  Yet while the Court has determined that force, threats, and intimidation were not present in Mr. Gonzalez-Morales' and Jane Doe's relationship, this is not to say that the relationship was appropriate.  Mr. Gonzalez-Morales' behavior was wholly inappropriate and unacceptable given Jane Doe's age. However, the Court finds that the relationship was, at the very least, reciprocal.  Jane Doe's

professions of love were sincere and uncoerced.  Moreover, the Court finds that Jane Doe chose

to leave New Mexico with Mr. Gonzalez-Morales of her own free will, and her travel was entirely

uncoerced.  Mr. Gonzalez-Morales did not forcibly seize, confine, inveigle, or kidnap Jane Doe.

Thus, the Court hereby **GRANTS** Mr. Gonzalez-Morales' second and third objections,

finding that he did not use force, threats, or intimidation against Jane Doe.

### C.   Objection to the Special Offense Characteristic at U.S.S.G. § 2G2.1(b)(2)

Finally, Mr. Gonzalez-Morales objects to the application of the special offense

characteristic in U.S.S.G. § 2G2.1(b)(2).  Doc. 74 at 1.  Specifically, he argues that "[n]either the

four level enhancement of § 2G2.1(b)(2)(B) nor the two level enhancement § 2G2.1(b)(2)(A)

applies because no sexual act was committed within the relevant conduct." *Id.*

Section 2G2.1(b)(2)(A) provides that "[i]f the offense involved . . . the commission of a

sexual act or sexual contact, increase by two levels."  Section 2G2.1(b)(2)(B) provides that "[i]f

the offense involved . . . (i) the commission of a sexual act; and (ii) conduct described in 18 U.S.C.

§ 2241(a) or (b), increase by 4 levels."   Application Note 2 provides, in relevant part, that

"'Conduct described in 18 U.S.C. § 2241(a) or (b)' is: (i) using force against the minor; (ii)

threatening or placing the minor in fear that any person will be subject to death, serious bodily

injury, or kidnapping; . . . ."  U.S.S.G. § 2G2.1 cmt. n.2.  A "sexual act" is defined, in relevant

part, as "contact between the mouth and the penis" or "the intentional touching, not through the

clothing, of the genitalia of another person who has not attained the age of 16 years with an intent

to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person."  18

U.S.C. § 2246(2); U.S.S.G. § 2G2.1 cmt. n.2.  "Sexual contact" is defined, in relevant part, as "the

intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast,

inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse

or gratify the sexual desire of any person."  18 U.S.C. § 2246(3); U.S.S.G. § 2G2.1 cmt. n.2.

Mr. Gonzalez-Morales objects to the four-level enhancement because he "adamantly denies that he is guilty of aggravated sexual abuse or that he committed the conduct described in 18 U.S.C. § 2241(a) or (b)."  Doc. 74 at 3.  Next, he objects to the two-level enhancement on several grounds.  *Id.*  First, he argues that the offense did not involve a "sexual act," because Jane Doe's touching of herself in the videos does not qualify as a sexual act—it did not involve the intentional touching "of another person."  *Id.* (quoting 18 U.S.C. § 2246(2)).  Second, he argues that the offense did not involve a "sexual act," because the oral sex took place a week after the last images were sent, and thus was not relevant conduct because it did not occur "during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense."  *Id.* (quoting U.S.S.G. § 1B1.3(a)(1) (defining relevant conduct under the sentencing guidelines)).  Finally, he argues that although the video of Jane Doe touching herself may qualify as "sexual contact" because masturbation qualifies as sexual contact under 18 U.S.C. § 2246(2), his own conduct did not involve sexual contact because he denies requesting any video depicting masturbation.  *Id.* at 4 (citing *United States v. Raiburn*, 20 F.4th 416, 422 (8th Cir. 2021)).

The government first responds that the four-level enhancement is appropriate because Mr. Gonzalez-Morales used the requisite force to sustain a conviction under 18 U.S.C. § 2241(a).  Doc. 55 at 6 (citing *United States v. Cerno*, 529 F.3d 926, 939 (10th Cir. 2008) ("[F]orce sufficient to sustain a conviction under 18 U.S.C. § 2241(a) includes . . . the use of a threat of harm sufficient to coerce or compel submission by the victim")).  The government next responds that the oral sex is relevant conduct pursuant to U.S.S.G. § 1B1.3(a)(1) because the possession of child pornography is a continuing offense.  Doc. 77 at 2 (citing *United States v. Santana-Castellano*, 74

F.3d 593, 597 (5th Cir. 1996); *United States v. Maxim*, 55 F.3d 394, 397 (8th Cir. 1995)).  Because

he still possessed sexually explicit videos and photos of Jane Doe at the time that he received oral

sex from her, the sexual act is relevant conduct because it occurred "during the commission of the

offense of conviction."  *Id.*  (quoting U.S.S.G. § 1B1.3(a)(1)).  Additionally, the government

argues that the oral sex is relevant conduct because, although uncharged, Mr. Gonzalez-Morales

could have been charged for offenses related to the oral sex, *e.g.*, Coercion and Enticement, in

violation of 18 U.S.C. § 2422, and Transportation of Minors, in violation of 18 U.S.C. §§ 2423(a)

and (b).  *Id.* at 3.  Because these uncharged offenses "were part of the same course of conduct or

common scheme or plan as the offense of conviction," because they were united by Mr. Gonzalez-

Morales' common purpose of pursuing a sexual relationship with Jane Doe, they—and the oral

sex—are relevant conduct.  *Id.* at 3–4 (citing U.S.S.G. § 1B1.3(a)(2); U.S.S.G. § 1B1.3 cmt. n.5(A)

("Application of this provision does not require the defendant, in fact, to have been convicted of

multiple counts.")).  Accordingly, the oral sex qualifies as relevant conduct because the Court may

consider "all harm that resulted from the acts and omissions" of the charged and uncharged

offenses.  *Id.* at 4 (quoting U.S.S.G. § 1B1.3(a)(3)).

The Court finds that that the two-level enhancement is appropriate for several reasons.

First, the Court finds that Mr. Gonzalez-Morales' offense involved sexual contact, because,

consistent with the Court's ruling on his first objection, the Court finds that Mr. Gonzalez-Morales

caused Jane Doe to produce the video of herself masturbating.  *See* 18 U.S.C. § 2246(2) ("sexual

contact" includes masturbation).  Second, the Court finds that Mr. Gonzalez-Morales' offense

involved sexual contact, because he both touched Jane Doe's buttocks and received oral sex from

her.  *See* 18 U.S.C. § 2246(3) ("sexual contact" includes the intentional touching of buttocks or

genitalia).  As argued by the government, these acts were relevant conduct because (1) Mr.

Gonzalez-Morales' possession of child pornography was a continuing offense, and (2) they were part of the same course of conduct or common scheme or plan as the offense of conviction. *See supra.* Finally, consistent with the Court's ruling on Mr. Gonzalez-Morales' second and third objections, the Court finds that Mr. Gonzalez-Morales' offense did not involve the conduct described in 18 U.S.C. § 2241(a) or (b). Specifically, although sexual contact occurred, the Court finds that such contact did not involve force, threats, or the fear of death, serious bodily injury or kidnapping. U.S.S.G. § 2G2.1 cmt. n.2. Therefore, the four-level enhancement is inappropriate.

Accordingly, the Court **GRANTS IN PART** Mr. Gonzalez-Morales' fourth objection, finding that his offense involved sexual contact, but that it did not involve the conduct described in 18 U.S.C. § 2241(a) or (b). Thus, a two-level enhancement pursuant to U.S.S.G. § 2G2.1(b)(2)(A) is applicable.

### D. Resulting Guidelines Sentencing Range

In accordance with the foregoing rulings, the Offense Level is 35 and the Criminal History Category is 1. The guidelines sentencing range is therefore 168 to 210 months. However, the maximum term of imprisonment is 10 years. *See* 18 U.S.C. §§ 2252A(a)(5)(B), (b)(2). Therefore, the guidelines term of imprisonment is 120 months. Probation recommends 120 months and 10 years supervised release. Doc. 48. The government recommends 120 months. Doc. 62 at 1. Mr. Gonzalez-Morales requests thirty-eight months, or time served. Doc. 72 at 22. Mr. Gonzalez-Morales has been in continuous custody since December 3, 2018 (1,178 days or 38 months and 20 days through February 22, 2022). Doc. 47 at 1.

## II. Sentencing

Pursuant to *United States v. Booker*, this Court must consider the advisory United States Sentencing Guidelines as well as each of the additional factors stated in 18 U.S.C. § 3553(a) in

imposing a reasonable sentence that is sufficient, but not greater than necessary, to comply with the purposes set forth in Section 3553(a).  *See United States v. Booker*, 543 U.S. 220, 245 (2005). Section 3553(a) requires the Court to consider the nature and circumstances of the offense and the history and characteristics of the defendant.  *See* 18 U.S.C. § 3553(a).  It also requires the Court to impose a sentence that complies with the purposes of sentencing, which include (1) retribution, (2) deterrence, (3) incapacitation, and (4) rehabilitation.  *Id.*  This Court carefully considered each of the Section 3553(a) factors, as well as the U.S. Sentencing Guidelines, and found that a sentence of 38 months imprisonment or time served, whichever is less, is appropriate in Mr. Gonzalez-Morales' case.

### A.  Nature and Circumstances of the Offense

Consistent with the Court's ruling on Mr. Gonzalez-Morales' second and third objections, the Court finds that the instant offense did not involve force, threats, intimidation, or coercion. Accordingly, the Court adopts and incorporates by reference the facts outlined *supra* in the subsections "Undisputed Facts" and "Mr. Gonzalez-Morales' Version."

### B.  Mr. Gonzalez-Morales' History and Characteristics

Mr. Gonzalez-Morales was born in Chiapas, Mexico to Levi Gonzalez-Vasquez and Blanca Morales-Morales.  Doc. 47 ¶ 59.  He has two younger siblings: Diego, age 19, and Jessica, age 25. *Id.* ¶ 60.  Diego has health complications involving his feet and his mother suspects that he has a brain tumor and neurological problems.  *Id.*  Mr. Gonzalez-Morales' father and sister work as farmworkers.  *Id.* ¶¶ 59–60.  His mother worked in a factory but is currently unemployed due to health issues.  *Id.* ¶ 59.  His brother is in school.  *Id.* ¶ 60.

Mr. Gonzalez-Morales' childhood was "painful," and he was "really sad [and] lonely most of the time."  *Id.* ¶ 62; Doc. 66 at 4.  Mr. Gonzalez-Morales describes his father as a severe

alcoholic.  Doc. 47 ¶ 63.  His father was frequently unfaithful and physically abusive to his mother. *Id.*  For example, he recalls his father hitting his mother every day, kicking his mother in the stomach with pointed-toe boots, throwing her against a glass cabinet, and chasing them in the market.  Doc. 66 at 4.  His father also physically abused him and his siblings with a belt or with his hands.  Doc. 47 ¶ 63.  At six or seven years old, he became aware of his father's sexual abuse of his sister, who would have been about three or four at the time.  Doc. 66 at 4.  He also became aware that his father's friends would come over and sexually assault his sister.  *Id.*  When he told his mother, she sent his siblings to live with her parents, but Mr. Gonzalez-Morales stayed with his parents to protect his mother until they finally separated.  *Id.*  He denies that he was ever sexually abused.  Doc. 47 ¶ 62.

His mother eventually left his father when he was about 9 years old and moved the family to live with her parents to escape the physical and sexual abuse.  *Id.*; Doc. 66 at 2.  A year later, when Mr. Gonzalez-Morales was about 10 years old, his mother emigrated to the United States to help financially support her family.  Doc. 47 ¶ 66; Doc. 66 at 2.  As a result, Mr. Gonzalez-Morales and his siblings were raised by their grandparents, rather than their parents.  Doc. 47 ¶ 66.  He did not see his mother again until he joined her in the United States approximately a decade later.  Doc. 66 at 2.  His family also kept her exact whereabouts from him, because his grandparents feared that he would share this information with his father.  *Id.*  Mr. Gonzalez-Morales reported that he had a good relationship with his maternal grandfather, but that his grandfather beat him a lot with a cable, sticks, or whatever was at hand so he would not end up like his father.  *Id.* at 4.  Mr. Gonzalez-Morales felt that his grandmother did not really love him.  *Id.*  For example, she would not feed him unless the whole family ate together, and he sometimes resorted to stealing food from the market just to eat.  *Id.*  In interviews with Dr. Christine Johnson, Mr. Gonzalez-Morales was

tearful when discussing his mother's absence.  *Id.* at 2.

Mr. Gonzalez-Morales was a shy adolescent.  Doc. 66 at 6.  For example, as a teenager, Mr. Gonzalez-Morales was bullied by a much older man in the neighborhood who stole from him, threatened him, and once put a pistol to his forehead.  *Id.*  He felt like he lagged behind his friends in getting together with girls and used alcohol to alleviate his shyness.  *Id.*  He also reported that his friends would take his money when he drank too much with them.  *Id.* at 8.

Mr. Gonzalez-Morales dropped out before graduating from high school because he failed his English class.  Doc. 47 ¶ 75; Doc. 66 at 5.  Although Mr. Gonzalez-Morales stated that he did well in school as a child, he reports that his grades declined as he got older due to bullying at school.  Doc. 66 at 5.  His mother and sister, on the other hand, stated that he always struggled in school.  *Id.* at 5–6.  However, they said he was a hard worker, even as a student, and worked selling coal and carting merchandise.  *Id.* at 5–6, 8.

After dropping out of school, he worked in Cancun and Tijuana, where he was primarily employed as a factory worker.  Doc. 47 ¶¶ 61, 77.  He explained that his motivation for moving to Tijuana was to be closer to his father, who was located "a day away" in Sonora.  Doc. 66 at 4.  He visited his father occasionally, despite his father behaving "terribly" and drinking a lot.  *Id.*  The last time Mr. Gonzalez-Morales visited his father, he said that his father tried to kill him, and he was only saved because his father's friend intervened.  *Id.*  Despite everything, Mr. Gonzalez-Morales affirms that "I still love him a lot."  *Id.* at 5.  His family confirmed this sentiment, with his mother saying, "He doesn't think ill of his father," and his sister saying, "He loves our father a lot.  He was always sad because of how our father was with us."  *Id.* at 5-6.

He emigrated to the U.S. around 2013, at the insistence of his mother.  Doc. 47 ¶ 61; Doc. 66 at 3.  He overstayed his short-term work visa and is currently undocumented.  Doc. 47 ¶ 61.  In

the United States, he worked in farm work, a poultry processing plant, a restaurant, and various factories, as well as collecting firewood.  *Id.* ¶ 77; Doc. 66 at 8.  He lived with his mother and siblings in Americus, Georgia.  Doc. 47 ¶ 61.

Mr. Gonzalez-Morales suffers from "complications in his legs that prevent him from walking straight."  Doc. 47 ¶ 70.  He reported that he was born with his feet "slightly off," and as a result he gets dizzy when he walks, and he walks sideways a lot.  Doc. 66 at 3.  His mobility problems were exacerbated by a work-related accident; he fractured his back while working in Tijuana, Mexico.  *Id.*; Doc. 47 ¶ 70.  Additionally, Mr. Gonzalez-Morales suffers from pain and weakness in his legs and back, numbness in his hands and upper body, stomach pain, headaches, and dizziness.  Doc. 66 at 20.  Although he has reported some longstanding, even congenital, medical issues, Dr. Johnson also noted that these symptoms may be a physical manifestation of his depression, anxiety, and alienation, given his tendency to minimize emotional distress.  *Id.* Additionally, on August 1, 2019, he sustained a four-centimeter laceration to the top of his head while incarcerated at the Cibola County Correctional Center.  Doc. 47 ¶ 71.

Prior to the instant offense, Mr. Gonzalez-Morales had never been diagnosed with any mental health issues.  *Id.* ¶ 73.  While at Cibola, however, he told his mother to stop sending him money and to forget about him because he did not want to burden his family.  *Id.*  He later described this moment to Dr. Johnson, explaining that he was experiencing suicidal ideation and asked God to take his life.  Doc. 66 at 9.  He also took three sleeping pills and a bunch of Tylenol and Ibuprofen that a fellow inmate gave him.  *Id.*  Reportedly, this was the second time he thought seriously about ending his life.  *Id.*  The first time was when he moved to the United States and was experiencing constant harassment at work.  *Id.*  At that time, he did not make a suicide attempt, but said that he wanted to be dead because he could not understand why people hated him and why he did not have

a girlfriend.  *Id.*  In addition to these moments, Mr. Gonzalez-Morales reported experiencing periods of sadness in his life as a result of his father's violence, substance abuse and abandonment; his mother's abandonment; his experience of bullying as a child; his experience of racial discrimination and harassment and his struggle to adjust in the United States; his undocumented status; his shyness and social anxiety; and his current legal situation and incarceration.  *Id.*  Dr. Johnson suggested the following relevant diagnoses: Other Specified Trauma- and Stressor-Related Disorder ("a broader diagnosis than PTSD"); Other Specified Depressive Disorder; Alcohol Use Disorder; and (Provisional) Unspecified Neurodevelopmental Disorder.  *Id.* at 23-25.

Mr. Gonzalez-Morales reported having used marijuana and cocaine a few times in his life. Doc. 47 ¶ 74.  He also consumed alcohol until he was 23.  *Id.*  Prior to his move to the United States, he was drinking a lot in Tijuana.  Doc. 66 at 3.  His desire to distance himself from "all the bad stuff over there" partially informed his move to the United States.  *Id.*  However, in his evaluation with Dr. Johnson, he reported increasing his alcohol use in the United States, as a way to cope with frequent racial discrimination.  *Id.* at 8.

In terms of his romantic and sexual relationships, Mr. Gonzalez-Morales reports being relatively inexperienced.  He reported that he had two girlfriends at around age 16.  *Id.* at 6.  He reported having his first sexual encounter with a girl at age 19 while drinking with a group of friends.  *Id.*  He briefly had a girlfriend in Sonora around age 18 or 19, and he reports having three girlfriends at different times while living in Tijuana.  *Id.* at 7.  He stayed with each girlfriend for approximately three to five months.  *Id.*  After moving to the United States, Mr. Gonzalez-Morales did not date anyone until he met Jane Doe online.  *Id.*  He reported that he "didn't feel comfortable speaking with women" because he was afraid his voice would crack, or he would stutter.  *Id.*  Dr. Johnson wrote that "[t]here were no indications in available information of previous sexually

abusive, exploitive or predatory behavior to suggest a pattern of such behavior over time." *Id.* at

27.

Many people perceive Mr. Gonzalez-Morales as naïve.   For example, his stepfather

described him as "very humble, a very simple kind of person, not like a lot of young people his

age." Doc. 66 at 9.  His sister stated:

> He is easily influenced, really naïve.  He didn't have any kind of malice.  He didn't
> think about things the same way as others his age.  Anyone can come along and
> make something sound good to him.  He is easily influenced.  He's so good hearted.
> Like sometimes my mom would send us stuff—money and clothing.  We depended
> on that so much.  We would know that we had to be gentle and hold on to [those
> things].  He would give his stuff away, like give someone his shoes.  The things he
> had, he earned them himself.  He is more innocent than his little brother.

Doc. 66 at 6.  Dr. Johnson also noted the impression of "significant naivete about psychological

and emotional concepts." *Id.* at 19.

Dr. Johnson also wrote that people like Mr. Gonzalez-Morales who have had early

exposure to a caretakers' abuse, neglect, or abandonment often develop maladaptive behaviors:

chronic feelings of insecurity and low self-esteem; fears of rejection and abandonment; social

anxiety and withdrawal; tendencies to minimize, deny, and avoid painful emotions; lack of self-

awareness; susceptibility to being influenced by others; and problems with emotional regulation.

*Id.* at 22.  She described him as "insecure, timid and shy . . . socially anxious and avoidant . . .

[and] lacking in self-awareness and self-confidence. *Id.* at 22–23.  He presented as "not socially

savvy" and "lacking much experience in romantic relationships." *Id.* at 23.  Dr. Johnson found

that Mr. Gonzalez-Morales' "judgment and problem-solving skills in the social domain would be

described as relatively weak." *Id.* at 25–26.  She suggested that "given his shyness and social

anxiety, conducting a romantic relationship at a distance, and with a teenaged girl, likely would

have been less threatening for him socially and emotionally, and easier for him to manage." *Id.* at

26. "His quick commitment to the relationship can also be seen as reflecting his social and emotional immaturity and poor social judgment." *Id.*

As his stepfather, Omar Leone, put it:

He so badly wanted to have the family he never had as a boy — He just let himself be led by the heart. . . . He was in love with her. . . . His only mistake was to fall in love with a girl he didn't really know — It's like he fell in love with a ghost.

*Id.* at 22.

Mr. Gonzalez-Morales conceptualizes his current incarceration as an "opportunity" to change his ways and get closer to God. Doc. 66 at 7. His faith is extremely important to him, and Dr. Johnson found that he "appeared to be coping with the high stress of his legal situation and incarceration largely through his strong attachment to his religious faith." *Id.* at 23.

If Mr. Gonzalez-Morales is deported subsequent to his incarceration, he plans to work for his uncle in Chiapas, Mexico, selling shrimp cocktails. Doc. 47 ¶ 65. He is also interested in starting a clothing retail business or opening a restaurant. *Id.*

### C. Deterrence

Mr. Gonzalez-Morales' criminal history is minimal. In addition to the federal charges at issue in this case, Mr. Gonzalez-Morales was charged with the state-level offenses of Contributing to the Delinquency of a Minor in New Mexico and Kidnapping in Mississippi. Doc. 47 ¶¶ 55–56. Additionally, Mr. Gonzalez-Morales was involved in a fight with another inmate on August 1, 2019. *Id.* ¶ 54. He was later sent to a local hospital to treat an open wound to his head. *Id.* The other inmate had only minor wounds that did not require further medical care. *Id.*

Based on the foregoing, Mr. Gonzalez-Morales appears to be at minimal risk of recidivism.

### D. Rehabilitation

Dr. Christine Johnson makes the following recommendations for Mr. Gonzalez-Morales'

rehabilitation:

(1) Mr. Gonzalez-Morales would benefit from intervention addressing his social, interpersonal and sexual adjustment. This could be achieved through programs designed for persons charged with domestic violence or with sex offenses. Such intervention should address his history of early trauma and related ongoing problems with self-image, self-esteem, emotional and stress management, management of aggression, and building healthy interpersonal and sexual relationships.

(2) Mr. Gonzalez-Morales would benefit from intervention for alcohol abuse upon his return to the community.

(3) Mr. Gonzalez-Morales should be referred for a psychiatric evaluation to determine whether psychotropic medication is appropriate to manage his depression and anxiety.

(4) It is strongly recommended that Mr. Gonzalez-Morales be supported in his connection to his religious faith, however possible, wherever he resides. His faith provides him with a positive identity and value structure, as well as social and emotional support.

(5) Mr. Gonzalez-Morales would benefit from education and/or training in work that would be satisfying for him. Further evaluation to determine realistic expectations of any education or training services is recommended.

Doc. 66 at 27–29.

### E. Just Punishment

With respect to the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to promote public safety, the instant offense was serious and involved sexual contact with a minor.

On the one hand, there is little to suggest that Mr. Gonzalez-Morales is a typical offender. He has never previously displayed an interest in minors. He has no connection to the child pornography community, and nothing in the record suggests he would have any interest in such a community. Unlike most people facing such charges, Mr. Gonzalez-Morales made no sophisticated concealment efforts to hide the photos and videos he had received from Jane Doe. Likewise, he possessed ten-fold fewer images than the median number of images possessed by other people charged under 18 U.S.C. §§ 2252A(a)(5)(B), (b)(2), and 2256. *See* U.S. Sent'g

Comm'n, *Federal Sentencing of Child Pornography: Non-Production Offenses*, 30 (2021).  By all appearances, Mr. Gonzalez-Morales believed he was in a consensual relationship, and therefore his crime was born of incredibly poor judgment rather than malicious intent.

Nevertheless, the surrounding circumstances of this offense are extremely serious and involve an underage minor performing oral sex on an adult.  This was entirely outside the bounds of what is legally acceptable, and it should never have happened.  Moreover, Jane Doe and her family have been permanently impacted by the instant offense and surrounding circumstances.  In a statement provided by Jane Doe's father, he reported that the family moved away from Española because they no longer felt safe there and because Jane Doe's classmates would "constantly say really ugly things to her."  Doc. 47 ¶¶ 31, 33.  He said that Jane Doe had suffered "a lot of psychological damage."  *Id.* ¶ 31.  He said the entire family had suffered quite a bit of depression and angst and had been going to counseling.  *Id.* ¶¶ 32, 35.  He also said that the trauma had made it more difficult for him to control his diabetes.  *Id.*  Thus, he asked the Court to give Mr. Gonzalez-Morales the highest sentence.  *Id.* ¶¶ 34–35.

**F. Appropriateness of a Downward Variance**

18 U.S.C. § 3553(a) requires this Court to impose a sentence that is "sufficient, but not greater than necessary" to comply with the sentencing factors set forth in that section.  The Court has carefully considered each of those factors and ultimately believes that the term of imprisonment recommended by the Sentencing Guidelines is far greater than necessary because it fails to account for the myriad circumstances that led Mr. Gonzalez-Morales to commit the instant offense and that mitigate his culpability.  The Court ultimately finds that the sentence that best serves the factors set forth in 18 U.S.C. § 3553(a) is a sentence of time served.  This will result in a downward variance from 120 months down to 38 months or time served, whichever is less.  The

Court comes to this conclusion for several reasons.

First, Mr. Gonzalez-Morales' guidelines range is primarily determined by unproven conduct to which he did not plead guilty and for which he was never charged.  Through the broad sweep of the Sentencing Guidelines' cross reference at U.S.S.G. § 2G2.2(c)(1), and the Tenth Circuit's interpretation of the same, Mr. Gonzalez-Morales is effectively being sentenced for production rather than possession of child pornography, and his sentencing guidelines range has been at least tripled.[3]  This does not raise any concerns under the Due Process Clause or the Sixth Amendment, due to the non-binding status of the Guidelines.  *See United States v. Redcorn*, 528 F.3d 727, 745–46 (10th Cir. 2008).  However, this fact is concerning to the Court.  Several Supreme Court cases have touched on just this concern.  In *Blakely v. Washington*, Justice Scalia expressed dismay at the sentencing guidelines' tendency to punish defendants based on uncharged conduct.  542 U.S. 296 (2004).  Under such a system "a judge could sentence a man for committing murder, even if the jury convicted him only of possessing the firearm used to commit it—or of making an illegal lane change while fleeing the death scene."  *Id.* at 306.  In *Apprendi v. New Jersey*, Justice Breyer presented an "egregious" hypothetical to highlight the problem with the sentencing guidelines:

> A prosecutor, for example, might charge an offender with five counts of embezzlement . . . while asking the judge to impose maximum and consecutive sentences because the embezzler murdered his employer.  And . . . the judge, not a jury, would determine the last-mentioned relevant fact, *i.e.,* that the murder actually occurred.

---

[3] Had the Court not applied the cross reference at U.S.S.G. § 2G2.2(c)(1), Mr. Gonzalez-Morales' base offense level would have been 18, and the Court would have assessed Special Offense Characteristics under U.S.S.G. § 2G2.2, rather than § 2G2.1.  Under Section 2G2.2, the Court finds three potentially applicable Special Offense Characteristics and determines that his total Offense Level would have been either 20 or 25.  *See* U.S.S.G. § 2G2.2(b)(5)–(7).  Thus, the applicable guidelines range would have been either 33 to 41 months or 57 to 71 months, instead of the current range of 168 to 210 months.

530 U.S. 466, 562 (2000) (Breyer, J., dissenting).

The Court is mindful that "the Sentencing Guidelines deserve careful consideration in each case and because they have been produced at Congress's direction, they cannot be ignored." *United States v. Grober*, 624 F.3d 592, 609 (3d Cir. 2010). At the same time, however, the Court recognizes that, in *Kimbrough v. United States*, 552 U.S. 85 (2007), the Supreme Court held that "a district has the discretion to vary from the recommended guideline range where the court determines such range is greater than necessary to achieve the sentencing objectives of § 3553(a)." *United States v. Jackman*, 512 F. App'x 750, 754, 753 (10th Cir. 2013). "Such a decision to vary may be based on a categorical disagreement with the applicable guideline apart from individualized consideration of § 3553(a)'s sentencing factors." *Id.* Indeed, a "district court that fails to recognize its discretion to vary from the guideline range based on such disagreement with a guideline may commit procedural error." *Id.* Under *Kimbrough,* this Court may therefore reject § 2G2.2(c)(1) "based not only on an individualized assessment of the § 3553(a) factors, but also on the categorical view that [this] guideline, or some portion thereof, overstates the seriousness of [Defendant's] offense." *Id.* at 754. Indeed, the Tenth Circuit has explicitly stated that, "[t]o be sure, district courts that disagree with § 2G2.2 may vary from the Guidelines." *United States v. Grigsby*, 749 F.3d 908, 911 (10th Cir. 2014).

Accordingly, the Court finds that, in this case, § 2G2.2(c)(1) yields an unreasonable sentence that is out of line with the § 3553(a) factors. Specifically, the cross reference is so sweeping as to apply to almost any child pornography case, without regard for the culpability of individual offenders. Because the Guidelines do not distinguish between a "run-of-the-mill" offender, a relatively well-intentioned and less-culpable offender such as Mr. Gonzalez-Morales, and the most dangerous or sophisticated offenders, the "result is fundamentally incompatible with

§ 3553(a)." *See United States v. Dorvee*, 616 F.3d 174, 186 (2d Cir. 2010).  The guidelines overstate the seriousness of Mr. Gonzalez-Morales' offense.  Therefore, after giving serious consideration to each of the factors set forth in Section 3553(a), and after carefully considering U.S.S.G. § 2G2.2, the Court finds that a sentence below the advisory guidelines range is sufficient but not greater than necessary to serve the goals of sentencing.

Additionally, the Court finds that a downward variance is appropriate after considering Mr. Gonzalez-Morales' young age, his lack of a criminal history, his lack of previous interest in minors, his history of profound trauma at a young age, and his history of mental health issues, including his history of suicidal ideation and his current diagnoses of Other Specified Trauma- and Stressor-Related Disorder and Other Specified Depressive Disorder.  The Court has also considered the extensive evidence of Mr. Gonzalez-Morales' naivety, his belief that Jane Doe was fifteen turning sixteen, his consistent interest in marriage with Jane Doe, and his understanding that marriage to a sixteen-year-old was legal in Georgia with parental consent,[4] which he believed he had.  Considering these factors, the Court finds that Mr. Gonzalez-Morales is far less culpable than the average defendant charged with violations of 18 U.S.C. §§ 2252A(a)(5)(B), (b)(2), and 2256.

Finally, while the Court takes into account the severity of the offense and other relevant conduct and recognizes the need to impose just punishment for the offense, the Court finds that Mr. Gonzalez-Morales has already been severely punished.  He has already served 38 months in prison while awaiting sentence.  As an immigrant, his incarceration was no doubt more severe due to his limited English-language skills and poor understanding of the U.S. legal system.  Moreover, because this term of imprisonment occurred during the pandemic, he was deprived of normal programming and opportunities for rehabilitation due to sweeping lockdowns.  Thus, his term of

---

[4] *See* Ga. Code Ann. § 19-3-2 (2018).

imprisonment has been unusually harsh.  Additionally, Mr. Gonzalez-Morales will suffer a number of onerous collateral consequences as a result of this conviction.  He likely faces deportation upon his release.  As a result of this deportation, he will also likely face a 10-year bar to returning to the United States.  In fact, as a result of this conviction, he may never be able to lawfully return to the U.S.  Consequently, he may never see most of his family in person again.  This is particularly harsh given Mr. Gonzalez-Morales' early separation from his mother at the age of ten.  *See* Doc. 66 at 2.  Including the years he was reunited with his mother in Georgia, Mr. Gonzalez-Morales has spent less than half his life, or just fourteen years, in the presence of his mother—and may never have the opportunity to do so again.  Even if he is able to return to the United States, this conviction will make it harder for him to get a job, secure stable housing, get other forms of public assistance, achieve the right to vote, and impose a number of other hardships.  A term of imprisonment is not the only form of punishment, nor the only valid one; these collateral consequences are a significant form of punishment unto themselves.

Based on all of these considerations, the Court concludes that a sentence below the guidelines range adequately takes into account the severity of Mr. Gonzalez-Morales' offense, while also taking into account his personal history and characteristics and the Court's policy disagreement with Section 2G2.2(c)(1).  The sentence imposed by the Court is sufficient to protect the public, is consistent with sentences imposed on other similarly-situated defendants, provides just punishment, promotes respect for law, and will serve as deterrence.

## CONCLUSION

For the foregoing reasons, as to Count 1 of Indictment 19-CR-0405, Mr. Gonzalez-Morales is committed to the custody of the Bureau of Prisons for a term of 38 months or time served, whichever is less.  Mr. Gonzalez-Morales is placed on supervised release for a term of 5 years.  If

Mr. Gonzalez-Morales is deported, said term of supervised release shall be unsupervised. If he is not deported, said term of supervised release shall be supervised.

Mr. Gonzalez-Morales must comply with the mandatory and standard conditions of supervision, including the standard sex offender conditions adopted by the District of New Mexico on July 20, 2018.  The following special condition will also be imposed because Mr. Gonzalez-Morales is a citizen of Mexico:  If deported, Mr. Gonzalez-Morales must not reenter the United States without legal authorization.

The Court finds the Mandatory Restitution Act of 1996 is applicable in this case; however, no claim for restitution has been made by the victim(s) in this case.  Therefore, none will be ordered.

Based on Mr. Gonzalez-Morales' lack of financial resources, the Court will not impose a fine.

Consistent with a stipulation in the Plea Agreement, Mr. Gonzalez-Morales forfeits his rights, title, and interest in the following assets and properties:  An Apple iPhone, A1549, FCC ID BCG-E2816A as listed in paragraph 17(a) of the plea agreement.

Mr. Gonzalez-Morales will pay a special assessment of $100 which is due during his supervised release.

Mr. Gonzalez-Morales is subject to the provisions of the Justice for Victims of Trafficking Act of 2015, which requires the Court to assess an amount of $5,000 on any non-indigent person or entity convicted of an offense under 18 U.S.C. Chapters 77, 109A, 110, 117; or Section 274 of the Immigration and Nationality Act.   The Court finds that Mr. Gonzalez-Morales is indigent and will not be required to pay the $5,000 assessment.

The Court finds that pursuant to the Plea Agreement, Mr. Gonzalez-Morales waives the

right to appeal the final sentence imposed by this Court, under 18 U.S.C. Section 3742(a).

**IT IS SO ORDERED** that a downward variance is appropriate, and Mr. Gonzalez-Morales is sentenced to a term of imprisonment of 38 months or time served, whichever is less.


ENTERED this 22nd day of February 2022.

MARTHA VAZQUEZ
SENIOR UNITED STATES DISTRICT JUDGE